# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

RICHARD J. MONTOYA,

        Petitioner,

vs.                                            Civil No. 97-0582 M/WWD

RON LYTLE, Warden, et al.,

        Respondent.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

    1.  THIS MATTER comes before the Court upon Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner ("Montoya") is currently incarcerated, pursuant to the judgment, sentence and commitment of the District Court of Dona Ana County, New Mexico and is represented by the Federal Public Defender.

    2.  Petitioner was charged with killing Robert Larson, an undercover sheriff's deputy who worked with the Metro Narcotic Agency, in a Las Cruces motel room where the two had met for Larson to purchase narcotics from Montoya.  Petitioner was also charged with robbing Larson of the money he was going to use to purchase the narcotics at the time Larson was killed.

    3.  Montoya denied that he had met Larson at the motel to steal his money, or for any purpose other than to sell Larson drugs.  Montoya testified that Larson had made a homosexual advance to him at the motel room, provoking a struggle during which Larson took out his firearm and attempted to shoot Montoya.  Montoya stated at trial that Larson was shot by his friend David Munoz, who was with Montoya at the motel.  Montoya presented a "bad cop" theory of defense at trial: that Larson was buying and selling drugs, both from Montoya and others, on his

own and not in an undercover police capacity and that Montoya was defending himself when Larson was killed.

4.    On April 8, 1983, Petitioner was convicted by a jury of first degree felony-murder and armed robbery of Robert P. Larson. (R. 206,207).[1]  He was sentenced to life imprisonment for the first degree murder conviction and to nine years imprisonment for the armed robbery conviction, to be served consecutively.  (R. 271, 272).  On appeal to the New Mexico Supreme Court, Montoya's convictions for both first degree felony-murder and armed robbery were affirmed (docket # 16 - Ans., Ex. D).[2]

5.    Respondents filed a motion to dismiss the federal petition (docket # 14).  This Court dismissed three claims from Montoya's petition  (docket ## 23, 29).  Since the time Petitioner filed his petition, he has been appointed counsel.

6.    Montoya presents nine issues in this petition:

I.      Whether Petitioner's right to the effective assistance of counsel was violated when his trial counsel failed to call and present the testimony of a witness at trial, because of a conflict of interest between Petitioner and the witness who had previously been trial counsel's client in a divorce proceeding against the person Petitioner allegedly killed in the case at bar;

II.     Whether Petitioner's rights to due process, a fair jury trial and the effective assistance of counsel were violated when his trial counsel failed to seek a change of venue from the city in which the crimes charged against Petitioner allegedly occurred to another venue where pretrial publicity had not been so intense;

III.    Whether Petitioner's right to effective assistance of counsel was violated when his trial counsel failed to raise necessary objections to the manner in which the prosecutor

_____

[1]  "R" refers to page numbers in the state court's Record Proper.    "T" (Tape) citations to the state record proper are to a Sony Model BM-88, with approximately 91 counters per tape side.

[2]  "Docket" refers to pleadings filed in the federal court record.

conducted his voir dire during jury selection and by the manner in which Petitioner's counsel conducted voir dire;

IV.     Whether Petitioner's right to the effective assistance of counsel was violated by his appellate counsel's failure to raise a claim of ineffective assistance of trial counsel in the direct appeal of Petitioner's convictions in the District Court;

V.      Whether Petitioner was denied his right to the effective assistance of counsel when his appellate counsel failed to raise as an issue the failure of his trial counsel to effectively confront and cross-examine police witnesses who testified concerning whether the alleged victim had police monies in his possession at the time of his death;

VI.     Whether Petitioner's right to the effective assistance of counsel was violated when his appellate counsel failed to raise a Fifth Amendment double jeopardy clause violation for Petitioner's sentence to separate prison terms for felony murder and armed robbery, the felony upon which the murder charge was predicated.

VII.    Whether Petitioner's right to the effective assistance of counsel was violated when his trial counsel failed to develop police entrapment of Montoya as an impeachment tool for cross-examining police officers who testified in his trial.

VIII.   Whether Petitioner's right to the effective assistance of counsel was violated when trial counsel failed to effectively confront and cross-examine a key state witness, who was crucial to proving the state's charge of armed robbery;

IX.     Whether Petitioner's rights to due process, confrontation of adverse witnesses, a fair jury trial and the effective assistance of counsel  were violated when the District Court refused to order the state to disclose past records of the Metro Narcotic Agency to Petitioner's trial counsel.

7.  Before turning to the merits of Petitioner's claims, I address a threshold issue involving

standard of review.

**Standard of Review under AEDPA**

8.  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[3] a

petitioner is entitled to federal habeas relief only if he can establish that the state court decision:

---

[3]  Pub.L.No. 104-132, tit.I, sec. 104 (codified at 28 U.S.C. §§ 2254(d),(e) (April 24, 1996)).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  §28 U.S.C.  2254(d).  A state court's factual findings are presumed correct, unless rebutted by clear and convincing evidence.  § 2254(e)(1).

9.  There is no merit to petitioner's contention that AEDPA does not apply to this case. Because this action was filed after AEDPA's filing date, the new provisions generally apply.  See Lindh v. Murphy, 521 U.S. 320, 337 (1997) (new AEDPA provisions generally apply only to cases filed after the Act became effective); Hatch v. Oklahoma, 92 F.3d 1012, 1014 (10th Cir. 1996) (AEDPA applies to all cases filed after April 24, 1996); Wallace v. Ward, 191 F.3d 1235 (10th Cir. 1999)(AEDPA applies to cases filed after its effective date, regardless of when state court proceedings occurred).

10.  Nor do I find any legal or factual basis to support Petitioner's contention that application of AEDPA to this case would be impermissibly retroactive.  See Moore v. Gibson, 195 F.3d 1152 (10th Cir. 1999) (application of AEDPA to cases filed after its effective date is not impermissibly retroactive); accord, Trice v. Ward, 196 F.3d 1151, 1158 (10th Cir. (Okla.) (where petitioner argued that AEDPA standards were inapplicable to his case because they would have an unconstitutional retroactive effect, court held that "AEDPA applies to cases filed after its effective date, regardless of when state court proceedings occurred") (citing Moore v. Gibson, 195 F.3d 1152 (10th Cir. 1999) and Landgraf v. USI Film Products, 511 U.S. 244 (1994)).[4]

---

[4]  Petitioner also bases his argument on a footnote in Lindh v. Murphy, 521 U.S. 320, 327 (1997) which, despite its holding regarding a general application of AEDPA to cases filed after the statute became effective, cautioned that its application to pending cases was appropriate when

11.   Petitioner also argues that if AEDPA applies to this case, the Court should apply a *de novo* standard of review to Petitioner's claims.  Respondent noted at the time that a Fourth Circuit case, Williams v. Taylor, had been granted certioriari by the Supreme Court.  119 S.Ct. 1355 (1999).   Since briefing was completed on this § 2255 petition, the Supreme Court has decided Williams, and has provided some guidance for the standard of review to be used by federal courts for habeas claims which have been reviewed by a state court.  See Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

12.   In Williams, the Supreme Court did not interpret the AEDPA statute in terms of whether to apply *de novo* review to mixed questions of law and fact, which include ineffective assistance claims.  Battenfield v. Gibson, 236 F.3d 1215, 1227 (10th Cir.2001); Williams, 529 U.S. at 402-403 (claims of ineffective assistance of counsel involve mixed questions of law and fact for purposes of review under § 2254).  Instead, the Court remained close to the statutory text in determining how state court decisions in habeas cases should be regarded by federal courts.

13.   In one of the two majority opinions in Williams, Justice Stevens indicated that *de novo* review has no place in reviewing habeas claims which have already been reviewed by a state court:

> The statutory text . . . does not obviously prescribe a specific, recognizable standard of review for dealing with either phrase.  Significantly, it does not use any term, such as "*de novo*" or "*plain error*" that would easily identify a familiar standard of review.  Rather, the text is fairly read simply as a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law in a given case.  Williams, 529 U.S. at 385.

---

its terms fit those cases at the particular procedural points they have reached.  Lindh at 329. Thus, the footnote referred to by Petitioner addressed *pending* cases, not those filed after the statute was enacted.

14. Thus, the phrase "*de novo*" review is irrelevant and useless as a measure of review under AEDPA's language, since the statute does not change a federal court's long-standing and "independent obligation to say what the law is," while at the same time it allows for a deferential review for reasonableness of the state court's application of the law.  <u>Williams</u>, 529 at 400-02 (O'Connor, J., concurring).

15.  Both Justice Stevens and Justice O'Connor, authors of the two majority opinions, also recognized the difficulties in interpreting Congressional intent for the AEDPA provision based on distinguishing habeas claims in terms of whether they were based on questions of law, or mixed questions.[5]  Instead, Justice O'Connor noted  that "for now it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause."  <u>Williams</u> at 408-09.  Justice O'Connor emphasized that "a federal court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law

---

[5] J. O'Connor:  Just as it is sometimes difficult to distinguish a mixed question of law and fact from a question of fact, it will often be difficult to identify separately those state-court decisions that involve an unreasonable application of a legal principle (or an unreasonable failure to apply a legal principle) to a new context.   Indeed, . . . in some cases it will be hard to distinguish a decision involving an unreasonable extension of a legal principle from a decision involving an unreasonable application of law to facts. . . . Today's case does not require us to decide how  such "extension of legal principle" cases should be treated under § 2254(d)(1). <u>Williams</u> at 408-09.

Justice Stevens also acknowledged that questions of law and questions of mixed law and fact commonly overlap.  Justice Stevens was not persuaded that the statute defined "two mutually exclusive categories of questions. Most constitutional questions that arise in habeas corpus proceedings – and therefore most "decisions" to be made – require the federal judge to apply a rule of law to a set of facts, some of which may be disputed and some undisputed."  <u>Williams</u> at 383.

erroneously or incorrectly.   Rather that application must also be unreasonable." Id. at 411;

accord, Thomas v. Gibson, 218 F.3d 1213, 1220 (10th Cir.2000)(quoting Williams).

16.  In defining the standard of review to be applied to habeas claims, the Williams Court

opted for interpretation of the statutory text available, discussing the separate "contrary to" and

"unreasonable application" prongs that have in the past generally been reserved for questions of

law or mixed questions of law and fact.[6]

17.  The Supreme Court illustrated its interpretation AEDPA's language in practical

scenarios, stating that a state court decision is "contrary to" established Supreme Court precedent

if the state court (1) arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or (2) decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  Williams, 529 U.S. at 405.  A state court decision involves an

"unreasonable application" of Supreme Court precedent if the state court identifies the correct

governing legal principle from Supreme Court decisions but unreasonably applies that principle to

the facts of the particular case.  Id. at 407; see Bouker v. Meeks et al, 2001 WL 459758 (10th

Cir. Kan.).  A state-court decision also involves an unreasonable application of this Court's

precedent if the state court either unreasonably extends a legal principle from Supreme Court

_____

[6]  The majority opinions differed as to whether these two phrases should be construed
together or separately.  Under Justice Stevens' analysis, any incorrect application of law to facts
rendered that state court decision also "contrary."  Justice O'Connor maintained that while a state
court decision may be incorrect, it may still be reasonable.  As long as that decision remained
legally correct as well, the decision should stand.  See Williams, at 407-08.

AEDPA's other language in § 2254(d)(2) -- whether the state court's decision "was based
on an unreasonable determination of the facts in light of the evidence presented in the State court
proceeding" -- was not before the Court in Williams.  529 U.S. at 386.

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  Williams 529 U.S. 362 at 407.

18.  The Tenth Circuit has followed this interpretation.  See Gonzales v. McKune,  F.3d 2001 391696 (10th Cir. Kan.) (citing Williams v. Taylor, 529 U.S. 362, 402-403 (2000)); Battenfield v. Gibson, 236 F.3d 1215, 1227 (10th Cir.2001).   Accordingly, I decline to accept Petitioner's position that *de novo* review applies as a standard of review for his petition, but instead follow the Williams' interpretation of the AEDPA language.

19.  Petitioner's challenge to the adequacy of the state adjudicatory findings for purposes of affording them deference is a moot one.  Based on this Court's review of the extensive state court record (58 trial tapes; 11 tapes on motions hearings; one tape on sentencing), Petitioner's claims would fail under a *de novo* standard of review as well, as set out below.

**Standard of Review for Ineffective Assistance of Counsel**

20.  Most of Montoya's claims are raised as ineffective assistance claims.  Under the analytical approach set forth in Strickland v. Washington, 466 U.S. 668, 690-92 (1984), the petitioner must demonstrate both that his trial attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by the deficient representation.  Because a petitioner must establish both of these prongs, ineffectiveness claims can be reviewed under either prong of this test.  Id., 466 U.S. at 697; Foster v. Ward et al.,182 F.3d 1177 (10th Cir. 1999).

**Issue One**

21.  Petitioner alleges that defense counsel was ineffective in failing to call an essential and favorable witness due to conflict of interest.  One of Montoya's defense counsel, Grace Duran, Esq., previously represented Larson's ex-wife, Phuoc Larson, in a divorce proceeding.  Montoya

8

understood that Ms. Larson was going to be a witness on his behalf to support the defense theory that Robert Larson was not acting within the scope of his duties as an undercover police officer at the time of his death.  According to Montoya, Larson's ex-wife would have testified about Larson's illegal narcotics activities in violation of policies and procedures of the Metro Narcotic Agency.  Petitioner also contends that Larson's alleged abusive behavior toward Phuoc Larson would have been relevant to Montoya's self-defense theory.

22.  Ms. Larson was never called as a witness, because, as Montoya was given to understand, there was "possible intimidation" of Ms. Larson taking place and she was afraid to testify.  Mem. at 38.  Petitioner contends that in choosing not to call Phuoc Larson as a witness, defense counsel acted in favor of her former client rather than Montoya, so that his ability to defend himself against charges of murder and armed robbery was severely prejudiced.

23.  In the context of a conflict of interest claim where there was no objection at trial, "the client must demonstrate an actual conflict of interest which adversely affected his lawyer's performance."  U.S. v. Bowie, 892 F.2d 1494, 1500 (10th Cir. 1990).  If the client can establish that the conflict actually affected the adequacy of his representation, prejudice is presumed. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).

24.  In this case, Petitioner knew of Ms. Duran's prior representation of Larson's ex-wife, and the record does not indicate that any objection regarding possible conflict was made at trial. Therefore, Montoya has the burden of showing specific instances to support his contentions of an actual conflict adverse to his interests.  U.S. v. Martin, 965 F.2d 839 (10th Cir. 1992).

25.  Even assuming Montoya's factual allegations to be true, he is not entitled to an evidentiary hearing on this claim.  See Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. Okla)

9

(even if petitioner's evidence was true, he would not be entitled to habeas relief). Further, I conclude that he has not demonstrated that an actual conflict existed. See Cuyler, 446 U.S. at 348 (noting possible conflicts are inherent in "almost every instance of multiple representation," but that ineffective assistance cannot be presumed from potential conflicts).

26. There is no evidence that the decision not to call Ms. Larson as a witness was other than one which involved trial tactics and strategy, and which are "virtually unchallengeable." Strickland, 466 U.S. at 690. Petitioner's statement that Ms. Larson was not put on the stand because she was being intimidated further belies the contention that counsel's conflict of interest was the cause.

27. Contrary to Petitioner's position, the omission of Phuoc Larson as a witness did not affect the presentation of exculpatory evidence at trial because it had no bearing on the issue of his guilt for the crimes with which he was charged. During a bench trial on the first day of trial, the presiding judge, Judge Garnett R. Burks ruled that evidence showing that Larson had engaged in illegal conduct would be allowed. However, the parties ultimately conceded that the information was relevant only to sentencing, but not to the adjudicative phase of the trial. T.1, 56.3 - 56.7.

28. Further, Judge Burks did not believe the information was relevant on the issue of guilt, since the charge was first degree murder "whether it's on a peace officer or anyone else." T.1, 52.6. In fact, the court recognized that allowing in this evidence warranted a jury instruction that specified its relevance to the sentencing issue only.[7]

---

[7] Judge Burks acknowledged that because the prosecution would be presenting evidence concerning use of the Metro Narcotics Agency logs as "essential background," that the defendant would have to be allowed the opportunity to present evidence related to that issue. T. 1, 53.9 -

29.  The evidence Phuoc Larson would have presented was determined by the Court not to be relevant to whether Montoya had met with Robert Larson to buy drugs or whether Larson was acting as undercover officer at the time.  Thus, the decision not to have Ms. Larson testify did not keep defense counsel from pursuing a seemingly valid or genuine alternative defense strategy or tactic.  And although the information was relevant to the issue of the imposition of the death penalty (see N.M.S.A. 1978 § 30-20A-5(A), murder of police officer acting in lawful discharge of duties at the time of his death), the jury did not impose the death penalty.  Petitioner obtained the same result had Phuoc Larson testified.  Thus, I find no merit to Petitioner's ineffective assistance claim based on conflict of interest.

**Issue Two**

30.  Petitioner alleges that his rights to due process, a fair jury trial and the effective assistance of counsel were violated when his trial counsel failed to seek a change of venue from the city in which the crimes charged against Petitioner allegedly occurred to another venue where pretrial publicity had not been so intense.

31.  Petitioner appears to be alleging both presumed and actual prejudice, based on media coverage creating an atmosphere that rendered it impossible to seat an impartial jury, and also on the number of jurors who expressed an inability to hear the case without bias.  I have reviewed the numerous newspaper clippings attached to Petitioner's brief as Exhibit A, listened to the voir dire tapes of the state record, and considered both parties' arguments, but find no support in the state record for Petitioner's allegation of ineffective assistance.

32.  Media coverage would have been expected in a case involving the shooting death of

_____

54.5.

an undercover cop in a drug buy/bust.  However, the amount and type of publicity generated did

not rise to the level that would have made it impossible to afford Petitioner a fair trial.  Most

newspaper accounts were published months before the trial (August 25, 1982 through November

9, 1982).  The articles which were published during the trial were broadly neutral and mostly

factual in nature.[8]  See Murphy v. Florida, 421 U.S. 794, 802 (1975) (media coverage not

sufficiently inflammatory to affect indicia of impartiality in jury panel where articles appeared

several months prior to trial and were largely factual in nature).

33.  Over half of the ninety prospective jurors had heard or read about Petitioner's case.

Twelve jurors had formed an opinion and stated that they would not be able to put that aside to

hear the evidence impartially.  These jurors were all excused.  R. at 261-63.  However, Petitioner

contends that "it is possible" that the other jurors either did not speak up about what they thought

about the case, even though they may have held views similar to the jurors who were excused for

cause.  Mem. at 45.

34.  A habeas petitioner attempting to show a due process violation because of a state trial

judge's failure to grant a change of venue motion must show more than a *possibility* of prejudice –

---

[8]  Petitioner's trial began March 28, 1983.  Articles published around this time dealt with announcing the setting of Montoya's trial date (March [illegible] 1983); describing that the defense theory would attempt to show that Larson was acting on his own behalf when he was killed (March 17, 1983); reporting on the progress of the trial, the state court's rulings and again noting that evidence would come in regarding improper procedure followed within the Metro Narcotics Agency (March 24, 1983); reporting on use immunity given to co-defendant Munoz (March 25, 1983).  Even allowing that the attached exhibits are not exhaustive, the nature of the published material is not such that would have incited a community to generalized bias.  In fact, the articles appear to have given equal time to the defense "dirty cop" theory.  Cmp., Irvin v. Dowd, 366 U.S. 717 (1961) (rural community subjected to barrage of inflammatory publicity immediately prior to trial, including information on defendant's prior convictions, confession to 24 burglaries and six murders including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence).

he "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently lacking in due process.'"   Hale v. Gibson, 227 F.3d 1298, 1350 (10th Cir. 2000).

35.   In the Hale case, newspaper accounts revealed details of the murder, kidnaping, ransom demand, defendant's arrest and arraignment on federal charges, and further detailed the cost to the county associated with escorting defendant to court by federal marshals.  The articles also included pictures of defendant and of the crime scene where the victim's body was eventually found.  The paper reported the impact on the community and the victim's family.  One article discussed related civil and criminal charges against the defendant.  Hale at 1331.

36.   Nevertheless, the Tenth Circuit held that the habeas petitioner was not denied due process and denied a motion to change venue based on pretrial publicity even though almost all of the prospective jurors (34 out of 37) had prior knowledge of the case, but none of the jurors stated they could not be fair and impartial.

37.   The presumption of a prospective juror's impartiality can be sufficiently rebutted if a juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.  See Irvin v. Dowd, 366 U.S. 717, 723 (1961).  Based on my review of the state voir dire tapes, I find no evidence that would suggest that the selected jurors were equivocal in their professed ability to put aside any knowledge or opinion that they had as a result of the media coverage.[9]

---

[9]  I note that Petitioner's brief lists a Mr. Gallegos as stating he had formed an opinion regarding the case, but could put it aside for trial.  Reply at 9.  Actually, Mr. Gallegos stated that he would not be able to hear the case with an open mind.  T.2, 18.5-21.7.  However, he was one

38. In order to challenge due process and the fairness of trial, a petitioner must show that the opinion of the selected jurors "raise[] the presumption of partiality." Irvin at 723. Petitioner has failed to do that here. Cases which have found prejudice to exist have much different factual scenarios from Petitioner's case, both in the type of media coverage, and also in the sheer number of jurors who express a bias.

39. In Irvin, 90% of the jurors examined tended to believe the defendant was guilty, and the court had excused for cause 268 of the 430 veniremen. See Murphy at 803 (citing Irvin). Newspapers and TV stations covered details of the defendant's background, including crimes committed when he was a juvenile, and convictions for arson that took place 20 years prior to the trial. See Irvin, 366 U.S. at 725. The Supreme Court held that the jury which convicted defendant of murder was not impartial.

40. In Murphy, of the 78 jurors who were questioned, 20 were excused for cause as having prejudged the petitioner. 421 U.S. at 796. Despite the fact that during the course of the trial, 7 of the selected jurors were exposed to various news accounts relating to the defendant's previous convictions, the trial court denied a motion for a mistrial, "relying on the jurors' assurances that they could maintain impartiality in spite of the news articles." At 797. The Supreme Court affirmed the trial court's decision which concluded that petitioner did not show he was denied a fair trial either in the setting of the trial or in the jury selection process. At 803 (excusing for cause 20 out of 78 jurors "may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own").

---

of the jurors excused for cause. R. at 262.

14

41.  In this case, only 13% of the prospective jurors stated that they had formed an opinion from what they had heard or read and could not put it aside.  The numbers do not suggest a mass prejudice at work against Petitioner such that he was denied due process or a fair trial.  Nor do I find that Montoya has shown that the pretrial publicity created actual or presumed prejudice.  Because this underlying claim lacks merit, Petitioner's ineffective assistance claim should be dismissed with prejudice.   See Strickland v. Washington, 466 U.S. 668, 687 (1984).

**Issue Three**

42.  Petitioner contends that his right to effective assistance of counsel was violated when his trial counsel failed to raise necessary objections to the manner in which the prosecutor conducted his voir dire during jury selection and by the manner in which Petitioner's counsel conducted voir dire.  Specifically, Petitioner alleges that both counsel failed to take time to explore whether the possible applicability of the death penalty to Montoya's case made them more likely to believe that he was guilty of the crimes with which he was charged.

43.  The idea that, whether the death penalty is imposed or not, the death qualification process is suggestive to jurors of a defendant's guilt, is not a new one, but the process itself has been found not to violate a defendant's right to an impartial jury.  Lockhart v. McCree, 476 U.S. 162, 177-183 (1986).  Voir dire examination "serves to protect [a defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984); see Gonzales v. Thomas, 99 F.3d 978, 983 (10th Cir.1996).  The critical inquiry is whether the voir dire process in this specific case offended notions of due process.

44.  The tenor of Petitioner's challenge to the voir dire conducted at his trial is that the

15

prosecutor did not attempt to rehabilitate those jurors with misgivings about the death penalty. Petitioner contends that the prosecution should have further questioned jurors who were disqualified from jury service in such a way that some of them would have indicated that they could consider the death penalty under certain circumstances.

45.  This contention has no merit.  Since Montoya was found guilty of the charges but did not receive the death sentence, he cannot seek habeas corpus relief based upon the exclusion of potential jurors unwilling to impose the death penalty.  Trujillo v. Sullivan, 815 F.2d 597, 604 (10th Cir. 1987) (citing Bumper v. North Carolina, 391 U.S. 543 (1968) and other cases).

46. More importantly, the brevity of counsel's supplementary voir dire is of little consequence when the trial court itself carried out the procedure in a way that comports with due process.  See Trujillo v. Sullivan, 815 F.2d 597, 607 (10th Cir. 1987) (no constitutional violation in trial court's choice to exclusively conduct death-qualifying portion of the voir dire where the means employed by trial court to test impartiality of potential jurors "created a reasonable assurance that prejudice would have been discovered if present").

47.  Based on the state court tapes, I find that in this case, the trial judge conducted an extensive examination of each juror on the death penalty issue.  Judge Burks asked (1) whether the juror opposed the death penalty for any reason; (2) whether (if opposed to the death penalty) the juror would, regardless of the facts or circumstances which may be presented by the evidence at trial, automatically refuse to vote for a verdict of guilty; and (3) whether (if the juror found the defendant guilty) the juror would, regardless of the facts and circumstances which may be presented by the evidence during the trial and the sentencing proceeding, automatically refuse to vote for the sentence of death.  T. 5, 20.3 - 23.7.

48. The Court's questioning was painstaking in making sure that the jurors understood the bifurcated process of guilt and sentencing, and explored, with each juror who presented with an opposition of some kind to the death penalty, not only whether there were *any* situations or circumstances under which that juror would impose the death penalty, but also whether the juror's views on the death penalty would affect the ability to be fair and impartial when determining whether Montoya was guilty or not.   See, e.g., T. 5, 24-7-25.8; 26-29.6; 30-35.

49. The questions defense counsel and the prosecution asked the jury panels were merely supplemental to the comprehensive and adequate voir dire conducted by the court which assured that Petitioner's due process rights were not violated and that he would be tried by jurors as free from partiality or prejudice as could be reasonably expected.[10]

50. Petitioner's assertion of defense counsel's inadequate rephrasing of certain questions which were posed to the jurors, e.g., concerning then Governor Toney Anaya's views about capital punishment, also fails.  The purpose of the voir dire is "to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case."  Trujillo at 607.

51. Having found no underlying constitutional violation in the voir dire process conducted prior to Montoya's trial, I find that there can be no ineffective assistance claim.  This claim should be dismissed with prejudice.

**Issue Four**

---

[10]  Also, as the Trujillo court noted, it seems "incongruous" for a petitioner to desire even more extensive probing and questioning regarding death qualification, considering the "deleterious effects that repetitive and intense death-qualifying voir dire can purportedly have on a potential juror's tendency to find guilt."  815 F.2d at 607, n.5.

52. Petitioner alleges that his right to the effective assistance of counsel was violated by his appellate counsel's failure to raise a claim of ineffective assistance of trial counsel in the direct appeal of Petitioner's convictions in the District Court.  Montoya contends that appellate counsel should have argued that trial counsel was ineffective in failing to (1) call Phuoc Larson as a witness; (2) move for a change in venue; (3) "effectively" question venire members about the death penalty; and (4) use entrapment as a means of impeaching witnesses on cross examination.

53. In determining whether appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, the question is whether the issue has merit.  United States v. Cook, 45 F.3d 388, 394 (10th Cir.), cert. denied, 119 S.Ct. 1053 (1995).  In order to have merit, the issue must be considered a "dead-bang winner" on appeal, i.e., an issue that is both obvious from the trial record, and one which would have resulted in reversal on appeal assistance.  Id. at 395.  When counsel omits an issue under these circumstances, counsel's performance is objectively unreasonable because the issue was obvious from the trial record, and the omission is prejudicial because the issue warranted reversal on appeal.  See  Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999).

54. The first three points Petitioner argues should have been raised have already been discussed in these findings, and have been found to have no merit.   If an omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. See Parker v. Champion, 148 F.3d 1219, 1221 (10th Cir.1998) (citing Cook, 45 F.3d at 392-93).

55. The fourth point (failure to cross-examine on an entrapment theory) is also meritless. The basis for this finding was set forth in this Court's Order of February 23, 1998, [docket #29],

and those findings are adopted herein.  Petitioner states that Officer Henry Diaz, sheriff of Dona Ana County, should have been discredited in order to raise a question about Larson's possession of money at the time of his death.  However, the gist of Officer Diaz' testimony was that no entries for withdrawals from the contingency fund were made by Larson in his personal ledger before August 24, 1982 (the day Larson was shot), yet $699.59 of the funds was not accounted for in the ledger.  Thus, it was not clear from the ledger whether Larson had withdrawn money on August 23 for a drug buy.  Diaz stated that he had made the entry on Larson's log for an August 24, 1982 withdrawal.  T. 35, 12.5 - 49.

56.  While the issue of whether Larson followed proper procedures in logging entries into the fund is relevant to a "dirty cop" defense (advancing the notion that Larson took money from the fund to deal on his own), it is irrelevant to the elements of the crimes with which Montoya was charged.[11]   The issue is closer to one of a "sufficiency of the evidence" claim on the question of whether Montoya took and carried away money with him from the victim, which was addressed in state court.  See Order, Feb. 23, 1998 at 2-3.

57. As with the other points Petitioner contends appellate counsel should have raised, this fourth point was not a "dead-bang winner."   Thus, Issue Four should be dismissed with prejudice.

**Issue Five**

58.  Petitioner contends that he was denied his right to the effective assistance of counsel when his appellate counsel failed to raise as a specific issue the failure of his trial counsel to effectively confront and cross-examine police witnesses who testified concerning whether the

---

[11]  The "dirty cop" theory would have been relevant only in the sentencing phase.  See ¶ 27, above.

alleged victim had police monies in his possession at the time of his death. Petitioner specifically challenges defense counsel's failure to object when Officer Diaz allegedly assumed that Larson took money from the contingency fund.

59. Having listened to the relevant portions of the state record, T. 35, 12.5- 65.0, I agree with Respondent that the sheriff did not testify that he assumed Larson took the money. Petitioner's allegation regarding Diaz' statements mischaracterizes his trial testimony. Although Diaz testified that he, as Larson's supervisor, had authorized two withdrawals of money for drug buys around August 23, 1982 , he responded in the negative when defense counsel asked Diaz if he could tell from the log whether Larson had withdrawn money on August 23, 1982. T. 35, 57.5-58.3.

60. Further, although the log did not reflect a withdrawal for the August 24th drug buy with Montoya, Officer Diaz told defense counsel on cross-examination that he could make a mathematical calculation from the log entries that Larson *may* have had on his person $1,124.37 at the time he met with Montoya on August 24th. This figure is based on Larson's last entry of $424.37 and Diaz' entry of $700.00 rounding off the amount missing from the funds. T.35 , 57.6- 61.1.

61. I do not find that defense counsel's performance was deficient. Statements made by Diaz which Petitioner purports to use as an stated assumption of Larson's possession of money were made during cross-examination, where defense counsel did not have the opportunity to object. Moreover, as Respondent points out, an objection would have weakened the "dirty cop" defense theory which was premised on the very assumption (that Larson took money from the fund without following authorized procedures) that Petitioner contends warranted an objection

from defense counsel.

62.  Petitioner acknowledges that the jury "was in as good a position as the sheriff to draw its own conclusion" regarding whether Larson did withdraw money for the transaction on August 24th.  Mem. at 24.  That is exactly what the jury did.  They listened to all the evidence, and determined that it was sufficient to prove beyond a reasonable doubt that Montoya had taken money from Larson.  This claim should be dismissed with prejudice.

**Issue Six**

63.  The Double Jeopardy Clause affords three distinct protections to a criminal defendant: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple criminal punishments for the same offense.  Jones v. Thomas, 491 U.S. 376, 380-81, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989).

64.  Montoya was given sentences to be served consecutively for both first-degree felony-murder and armed robbery, the felony upon which the murder charge was predicated. He asserts an ineffective assistance claim based on appellate counsel's failure to raise a Fifth Amendment double jeopardy clause violation based on multiple punishments for the same offence.

65. On June 1, 1983, at the time Montoya was convicted,[12] a defendant could be convicted and sentenced for both felony murder and the predicate felony upon which the felony murder was based.  See State v. Stephens, 93 N.M. 458 (1979).  Years after Montoya's conviction became final, in State v. Contreras, 120 N.M. 486, 903 P.2d 228 (1995), the New Mexico Supreme Court overruled Stephens (120 N.M. at 491).  Contreras held that a person "cannot be convicted of and

---

[12]  See R. at 271.

sentenced for both felony murder and the underlying felony when one's conduct is unitary,"

following the analysis set forth in <u>Missouri v. Hunter</u>, 459 U.S. 359, 366 (1983) (double jeopardy

is violated when defendant is convicted and punished for two offenses imposed in same trial,

against the intent of the state legislature) and <u>Whalen v. U.S.</u>, 445 U.S. 684, 694 (1980).[13]  The

<u>Contreras</u> court specifically noted that it retained the "ultimate authority to interpret" its own

state statutes and was not "necessarily bound" by the analysis used in <u>Whalen</u>.  120 N.M. at 491.

66.  Petitioner argues that because <u>Contreras</u> interpreted the same felony murder statute

that applies to Montoya's case, and because the intent of the legislature in promulgating that

statute could not have changed after Montoya was convicted but was always the same, that

<u>Contreras</u>' holding applies to his case as well.

67.  Notwithstanding the fact that Montoya was convicted under same statute as

Contreras, this claim still fails.  The New Mexico Supreme Court has explicitly held that the ruling

in <u>Contreras</u> is limited to prospective application only.   <u>Jackson v. State</u>,122 N.M.433 (1996)

(applying the <u>Contreras</u> holding prospectively).  The court's purpose in <u>Contreras</u> was to "discern

[state legislative intent] in a manner consistent with the rationale of the United States Supreme

Court in its interpretation of Congressional intent relative to multiple punishments under like

circumstances."  <u>Id</u>. 434.  The court held that <u>Contreras</u> "did not state what the law had been;

rather, it adopted a new rationale to interpret legislative intent, bringing New Mexico into line

with the application of the Double Jeopardy Clause in the U.S. Supreme Courts and most courts

---

[13]  The <u>Whalen</u> Court construed the penal provisions of the District of Columbia Code and
concluded that conviction for killing in the course of a rape cannot be had without proving all the
elements of the offense of rape, and thus violated the Double Jeopardy Clause.  445 U.S. at 692-
93.  But <u>Whalen</u> recognized the limitation of its holding as specific to that particular penal
provision and to the case before the Court.

of other states." <u>Id</u>. at 435.[14]

68.  Montoya's rights under the Fifth Amendment are not violated because <u>Contreras</u>'

holding does not apply retroactively to his case.  The state court has the inherent power to give its

decisions retroactive or prospective application without constitutional principles.  <u>Jackson</u>, 122

N.M. at 434.  Nor does the federal constitution impose any requirement that state judicial

decisions be applied retroactively, and the issue whether a state court decision applies

retroactively is a state law issue, which may not be afforded federal habeas relief.   <u>Jackson v.

Shanks</u>, 143 F.3d 1313, 1324 (10th Cir. 1998).

69.  The Supreme Court has held that in the context of multiple punishment, "the Double

Jeopardy Clause does no more than prevent the sentencing court from prescribing greater

punishment than the legislature intended."  <u>Missouri v. Hunter</u>, 459 U.S. at 366, <u>cited in</u> <u>Lucero v.

Kerby</u>, 133 F.3d 1299, 1316 (10th Cir. 1998).  Montoya's sentence was within these parameters,

since at time of his conviction the sentencing court did not mete out punishment greater than was

allowed or intended by the state legislature at the time.

70.  Counsel's conduct cannot be considered deficient for failing to raise an issue based on

state law which did not exist at the time.  The reasonableness of counsel's representation is

viewed in light of the law as it existed at the time of the representation.  "[C]lairvoyance is not a

---

[14]  In <u>Jackson</u>, the state court rejected Mr. Jackson's double jeopardy claim, which was also based on <u>Contreras</u>.   Jackson, like Montoya, was convicted of both felony murder and the predicate offense of armed robbery before the New Mexico Supreme Court decided <u>Contreras</u>. Jackson raised the issue again in his federal habeas petition, which the federal district court found to be procedurally barred.  On appeal of the denial of the habeas petition, the Tenth Circuit considered the claim because the state court had addressed the claim on it merits.  However, the Tenth Circuit determined that Mr. Jackson's double jeopardy rights were not violated when the state court did not apply <u>Contreras</u> to his conviction.  <u>See</u> <u>Jackson v. Shanks</u>, 143 F.3d 1313 (10th Cir. 1998).

required attribute of effective representation."  United States v. Gonzales-Lerma, 71 F.3d 1537,

1541 (10th Cir. 1995), cert. denied, __ U.S. __, 116 S.Ct. 1341 (1996); Lilly v. Gilmore, 988 F.2d

783, 786 (7th Cir.1993) ("The Sixth Amendment does not require counsel to forecast changes or

advances in the law, or to press meritless arguments before a court."), cited in Sherrill v. Hargett,

184 F.3d 1172, 1176 (10th Cir. 1999).  Thus, this claim should be dismissed with prejudice.

**Issues Seven and Eight**

71.  The next two issues are premised on the failure of Petitioner's trial counsel to develop

police entrapment as an impeachment tool for cross-examination of testifying police officers and

failure to confront and effectively cross-examine Officer Diaz at trial.

72.  These two issues have been adequately taken up with the discussion above as well as

in this Court's previous Order [docket # 29].  Petitioner urges the Court to reconsider its ruling.

73.  In general, there are three grounds for granting a motion to reconsider: 1) if a

manifest error of law or fact has been committed by the court; 2) if new evidence has been

discovered; and 3) if there has been an intervening change in controlling law.  See Servants of the

Paraclete, Inc. v. Great American Ins., 866 F.Supp. 1560, 1581 (D.N.M. 1994).  A motion to

reconsider is appropriate when the court has obviously misapprehended a party's position or the

facts or applicable law, or when the party produces new evidence that could not have been

obtained through the exercise of due diligence.  Benedictine College v. Century Office Products,

866 F. Supp. 1323, 1326 (D.Kan.1994).

74.  Having carefully reviewed the pleadings submitted in this habeas petition as well as

the state record proper and tapes of the state court proceedings, I find that Petitioner has not

presented any legal or factual basis which would persuade me to reconsider my rulings on these

issues.  Issues seven and eight should be dismissed with prejudice.

**Issue Nine**

75.  Finally, Petitioner contends that his rights to due process, confrontation of adverse witnesses, a fair jury trial and the effective assistance of counsel  were violated when the District Court refused to order the state to disclose past records of the Metro Narcotic Agency to Petitioner's trial counsel.

76.  In stating this claim, Petitioner essentially repackages issues already addressed by the Court.  Instead of framing the issue as counsel's failure to develop testimony concerning the Metro Agency logs, Petitioner states the claim in terms of production of the logs themselves.[15]

77.  Violations of state evidentiary rulings may not be questioned in federal habeas proceedings unless they render the trial "so fundamentally unfair as to constitute a denial of federal constitutional rights."  Escobar v. O'Leary, 943 F.2d 711, 720 (7th Cir.1991) (citation omitted); Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) ("Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

78.  This claim was previously addressed within the context of Petitioner's federal habeas petition.  See docket # 23, at 2-3, and # 29.   Further, the trial court's evidentiary ruling with regard to the logs was also addressed by the state court of appeals.  The court of appeals stated that "whether the victim was engaged in an unauthorized practice is irrelevant to defendant's conviction of armed robbery and murder.  The victim's alleged unauthorized behavior can in no

---

[15]  The trial court ruled that wholesale production of the logs was not necessary, and only those portions relating to Robert Larson's entries would be allowed in as evidence.

25

way justify armed robbery and murder." Ex. D, at 2-3.

79. I find that the state court's analysis and conclusion comports with AEDPA's requirements that federal habeas relief be granted only when the state court decision resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

80. Under clearly established United States Supreme Court law, Petitioner was entitled to a fair trial. See U.S. v. Hasting, 461 U.S. 499, 508-09 (1983) ("there can be no such thing as an error-free, perfect trial, ... the Constitution does not guarantee such a trial"). In barring admission of evidence which was irrelevant to the offenses with which Montoya was charged, the trial court did not commit an error, much less one that was so prejudicial so as to render Montoya's entire trial fundamentally unfair. See Lockhart v. Fretwell, 506 U.S. 364 (1993); Martin v. Kaiser, 907 F.2d 931, 934 (10th Cir. 1990). This claim should be dismissed with prejudice.

**Recommendation**

I recommend that Petitioner's application for Writ of Habeas Corpus be denied and that this cause be dismissed with prejudice in its entirety.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C).


_____

UNITED STATES MAGISTRATE JUDGE